**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff - Appellee*,

v.

KEENON GREEN,

*Defendant - Appellant*.

No. 23-1294

D.C. No.
3:22-cr-00187-
CAB-1

OPINION

Appeal from the United States District Court
for the Southern District of California
Cathy Ann Bencivengo, District Judge, Presiding

Argued and Submitted May 13, 2025
Pasadena, California

Filed September 10, 2025

Before: Ryan D. Nelson, Kenneth K. Lee, and Jennifer
Sung, Circuit Judges.

Opinion by Judge Lee

# SUMMARY[*]

## Criminal Law

The panel affirmed the district court's denial of Keenon Green's motion for discovery by which Green sought to pursue a selective enforcement claim, and the sentence imposed by the district court, in a case in which Green was convicted of attempted sex trafficking of a minor and attempted sexual enticement of a minor.

Before trial, Green, who is Black, unsuccessfully sought discovery to pursue a selective enforcement claim based on race discrimination. He argued on appeal that the district court failed to properly apply *United States v. Sellers*, which gives courts the discretion to determine whether a criminal defendant has provided "*something* more than mere speculation to be entitled to discovery" about selective enforcement. 906 F.3d 848, 855 (9th Cir. 2018).

The panel held that the district court did not abuse its discretion in rejecting Green's discovery requests, given that he relied on an unreliably small sample size of past cases to claim selective enforcement.

Rejecting Green's argument that the district court ignored his unwarranted sentencing disparity claim under 18 U.S.C. § 3553(a)(6), the panel concluded that the district court did not abuse its discretion by imposing a 144-month sentence.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Mark R. Rehe (argued), Jill Streja, and Daniel E. Zipp, Assistant United States Attorneys, Office of the United States Attorney, United States Department of Justice, San Diego, California; for Plaintiff-Appellee.

Paul A. Barr (argued), Attorney, Federal Defenders of San Diego, Inc., San Diego, California; for Defendant-Appellant.

**OPINION**

LEE, Circuit Judge:

Some people use Instagram to keep in touch with friends and family. Others like to follow their favorite celebrities or athletes. And then there is Keenon Green: He used Instagram to offer his services as a pimp to a person he believed to be a 16-year-old girl from San Diego. In reality, he was communicating with an undercover officer. As a result of the online sting operation, Green was arrested, charged, and convicted of attempted sex trafficking of a minor, 18 U.S.C. § 1591(a) & (b)(2), and attempted sexual enticement of a minor, *id.* § 2422(b).

Before trial, Green, who is Black, unsuccessfully sought discovery to pursue a selective enforcement claim based on race discrimination. On appeal, he argues that the district court failed to properly apply *United States v. Sellers*, which gives courts the discretion to determine whether a criminal defendant has provided "*something* more than mere

speculation to be entitled to discovery" about selective enforcement. 906 F.3d 848, 855 (9th Cir. 2018).

We conclude that the district court did not abuse its discretion in rejecting Green's discovery requests, given that he relied on an unreliably small sample size of past cases to claim selective enforcement. We also reject his argument that the district court abused its discretion at sentencing by ignoring his unwarranted disparity claim under 18 U.S.C. § 3553(a)(6). We affirm.

## BACKGROUND

The San Diego Human Trafficking Task Force—consisting of federal, state, and local law enforcement officers—sometimes uses online sting operations to ferret out sex trafficking.

In June 2021, a deputy created a fake Instagram account under the handle "lexxmiche." In creating the account, the deputy chose the name "Lexi" and included photographs, emojis, and a hashtag intended to show a connection to prostitution. The photos included "risqué" pictures of a white woman, lingerie, heels, and stacks of money. The emojis featured a diamond, rose, crown, and money bags—all signs that the deputy testified relate to prostitution in the online world. And the hashtags included the number "304," which the deputy testified means "hoe."

In operating the lexxmiche Instagram account, the deputy followed certain practices. She never "initiated communication" with other Instagram users; she "responded" to each user who "sent a message" to her; and she "continued messaging with Instagram users unless and until" it became clear that the user "was not seeking to engage in sex trafficking activity in San Diego County."

Keenon Green, too, was on Instagram, using the handle "djokovic_11." At some point, the lexxmiche account and the djokovic_11 account started "following" each other, although it is unknown which account followed the other first.

Although the djokovic_11 account did not include a profile photo, the deputy testified that she viewed one or more "stories" from the djokovic_11 Instagram account before Green sent her the first direct message. As noted during Green's trial, an Instagram "story" is like a post but can only be viewed by other users for 24 hours. If a user views another user's story, the viewer's username is visible to the story's creator for up to 48 hours.

In December 2021, Green sent the first direct message to the lexxmiche account via Instagram: "Yo, you're from San Diego? Just curious. I recently moved to Fashion Valley. It really be fake dry as far as nightlife, but the city is velvet."[1] The deputy posing as "Lexi" confirmed she was from San Diego. Green then asked "Lexi" to meet with him, a request the deputy did not respond to. After sending a few more messages that went unanswered, Green stated, "I attempted to maybe, possibly become partners in crime, but you couldn't even give me an opportunity. It's good. I really did think you was different. But thanks." The deputy responded, "LMAO. What? You're whack." The deputy and Green then exchanged messages intermittently over the next day.

---

[1] The messages exchanged between "Lexi" and Green were introduced as exhibits and also read into the record. To aid the reader, this opinion uses the spelling and punctuation that appear in the court transcript rather than the messages themselves, which contain nontraditional spelling and punctuation.

The next month, Green sent a message to "Lexi" proposing that they meet up in person and "have an authentic conversation." The deputy responded by asking Green, "What are your rules?" The deputy asked about rules because she believed that Green was asking about working with him as a prostitute and in the context of "a pimping and prostitution relationship, there's going to be rules that are established by the pimp or the trafficker for the prostitute to follow." Such rules may include "how much money" or "whether or not they're required to work out of town." The deputy later followed up by asking whether Green required a "choose up" fee, which is money that a prostitute pays to a pimp to start working with him. Green indicated he did not.

The next day, the deputy sent Green an Instagram message intended to "put into the air that [she] was potentially underage" to "see if he was willing to prostitute out a juvenile." The deputy told Green that she had been "busy with schoolwork" the day before. After the deputy explained that she had been doing her biology homework, Green asked her if she was in high school. The deputy said that she was "finishing it up online." Green then asked, "How old are you?" to which the deputy answered, "16?" The deputy testified that she included the question mark not to signify a lack of knowledge about her age but to mean "is that okay?" and "why are you asking?" Green responded by telling "Lexi" to call him and provided his cell phone number.

The rest of the messages between Green and the deputy took place over text message. Green asked when he and "Lexi" could meet in person. The deputy wrote back asking Green how he could help her. Green explained his plan for "Lexi" to work "the blade" (or street) for about a week until he got a fake ID for her so that she could advertise online

and charge more.  Eventually Green asked "Lexi" when she wanted to start.  When the deputy suggested the next week, Green replied, "Sound[s] perfect."

On January 13, "Lexi" and Green made plans to meet the next day at a park.  Multiple law enforcement officers were at the park when Green arrived.  Green at first told one of the agents that he had been in the park that day to meet "Lexi" to help her and take her to the authorities.  Eventually, though, Green admitted to the agent that he did "the wrong thing."  He admitted that he should not have "attempted to lure a 16-year-old girl, into helping her, solicit herself."

Green was arrested, charged, and ultimately convicted of attempted sex trafficking of a minor, 18 U.S.C. § 1591(a) & (b)(2), and attempted sexual enticement of a minor, *id.* § 2422(b).  Before his trial, Green sought discovery to pursue a selective enforcement claim based on race discrimination, which the district court denied.  On appeal, Green argues that the district court abused its discretion in denying the motion because it applied the wrong legal standard.  Green also appeals from his 144-month sentence. He argues that the district court procedurally erred in issuing his sentence because it glossed over his unwarranted disparity claim under 18 U.S.C. § 3553(a)(6).

## STANDARD OF REVIEW

We review for abuse of discretion the district court's determination that a defendant failed to make the requisite showing that would entitle him to discovery to pursue a selective enforcement claim.  *Sellers*, 906 F.3d at 851, 855. The district court "necessarily abuses its discretion when it applies the wrong legal standard."  *Id.* at 852.

When reviewing sentencing decisions, we "must first ensure that the district court committed no significant procedural error," such as "failing to consider the § 3553(a) factors." *Gall v. United States*, 552 U.S. 38, 51 (2007). "Assuming that the district court's sentencing decision is procedurally sound," we then "consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." *Id.*

## DISCUSSION

We affirm the district court's denial of Green's motion for discovery to pursue a selective enforcement claim and the 144-month sentence imposed by the district court.

## I. The district court did not abuse its discretion in denying discovery to pursue a selective enforcement claim.

### A. We have adopted a flexible standard for permitting discovery into a selective enforcement claim.

The Supreme Court has held that the U.S. Constitution bars both "selective enforcement" of the law and "selective prosecution" based on race. *Whren v. United States*, 517 U.S. 806, 813 (1996) (selective enforcement); *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (selective prosecution). The latter claim concerns a prosecutor's choice of who to prosecute and with what specific charges; the former involves a law enforcement agency's decision to investigate or arrest a person in the first place. *Sellers*, 906 F.3d at 851 n.5, 855–56.

The substantive elements of both types of claims are the same. A defendant must establish both (1) a discriminatory effect and (2) a discriminatory intent. *See Lacey v.*

*Maricopa County*, 693 F.3d 896, 920, 924 (9th Cir. 2012) (en banc). The discovery requirements for both types of claims, however, are not the same. What a defendant must show to be entitled to discovery differs depending on which type of claim he or she asserts—selective enforcement or selective prosecution. *See Sellers*, 906 F.3d at 855.

For a selective prosecution claim, the standard for discovery is "nearly as rigorous as that for proving the claim itself." *Id.* at 852. As the Supreme Court held in *Armstrong*, defendants must present "some evidence tending to show the existence" of a "discriminatory effect and discriminatory intent." *Armstrong*, 517 U.S. at 468 (quotation omitted). Furthermore, defendants must present "some evidence" that "similarly situated defendants of other races could have been prosecuted, but were not." *Id.* at 469.

But for discovery involving a selective *enforcement* claim—at issue here—the Supreme Court has not yet spoken. Our court, however, held in *Sellers* that the "rigorous" discovery standard for a selective prosecution claim does not apply. 906 F.3d at 852–53. Instead, for a selective enforcement claim, the test is more relaxed, vesting broad discretion in the trial court. As *Sellers* put it:

> Contrary to *Armstrong*'s requirements for selective prosecution claims, a defendant need not proffer evidence that similarly-situated individuals of a different race [or other protected class] were not investigated or arrested to receive discovery on his selective enforcement claim in a stash house reverse-sting operation case. While a defendant must have *something* more than mere speculation to be entitled to discovery,

what that *something* looks like will vary from case to case. The district court should use its discretion—as it does for all discovery matters—to allow limited or broad discovery based on the reliability and strength of the defendant's showing.

*Id.* at 855. Additionally, *Sellers* concluded that although a defendant "will eventually need to show both elements" to prevail on a selective enforcement claim—that is, a discriminatory intent and effect—obtaining discovery for a selective enforcement claim does not require "some evidence" tending to show the existence of both. *Id.* at 856 (quotation omitted).

There are two reasons for this more relaxed approach. First, "law enforcement officers do not enjoy the same strong presumption that they are constitutionally enforcing the laws that prosecutors do." *Id.* at 853. Second, "[a]sking a defendant claiming selective enforcement to prove who *could* have been targeted by an informant, but was *not*, or who [law enforcement] *could* have investigated, but did *not*, is asking him to prove a negative; there is simply no statistical record for a defendant to point to." *Id.* Conversely, in the selective prosecution context, "statistical evidence of differential treatment is ostensibly available," that is, one can "compar[e] who was arrested with who was prosecuted." *Id.*

Having set forth the applicable discovery standard for selective enforcement claims, *Sellers* then turned to the evidence that the defendant submitted in support of his motion for discovery. Sellers, who was Black, took issue "with how he was targeted at the outset" by law enforcement in their stash-house reverse-sting operation. *Id.* at 851 n.5.

In support of his motion for discovery, Sellers submitted evidence that included "data collected by an attorney in the Central District of California showing that of 51 defendants indicted in stash house reverse-sting operations between 2007 and 2013, at least 39 were black or Hispanic." *Id.* at 851. Similarly, an agent involved in the operation that led to Seller's arrest testified that "more than 55 of the approximately 60 individuals who ha[d] been indicted in his stash house reverse-sting operations [were] people of color." *Id.*

This court ultimately did not decide, however, whether such data met the threshold showing for obtaining discovery. Because the district court had not applied the correct legal standard, we "follow[ed] our normal practice of remanding to the district court to determine in the first instance whether Sellers ha[d] met the [correct] standard." *Id.* at 855.

**B. The district court applied the correct standard in rejecting Green's request for discovery for his selective enforcement claim.**

Green argues that the district court applied the wrong legal standard when it denied his motion for discovery to pursue a selective enforcement claim based on race discrimination. Green points to three alleged errors. First, Green argues that the district court incorrectly concluded that there was not "a sufficient basis here to go forward with any claim . . . that there's discriminatory intent." Second, Green contends that the district court wrongly suggested that a selective enforcement claim was not viable "given the nature of the offense where no one solicited the defendant" and "[h]e initiated the conduct here with the undercover officer." Third, Green maintains that the district court erred in concluding that other cases identified by Green "tend to

reflect more of a prosecutorial decision-making" process "as opposed to demonstrating that the task force is selectively targeting black men for investigation."

One challenge in evaluating these potential errors is that there is no written decision. The district court provided an oral decision during a motions in limine hearing, and that decision consists of no more than a few lines. Further, some of the district court's comments are somewhat ambiguous. In denying Green's motion for discovery, the district court stated:

> I have read the papers submitted on the motion for the discovery. The Court is going to deny that motion. I don't think that the defendant has established a sufficient basis to get the discovery requested.

> The San Diego Human Trafficking Task Force, as pointed out by the government[,] investigates many kinds of human trafficking crimes. They are prosecuted both in state and federal court, and although the defendant identified a very small number of individuals who are chosen to be prosecuted in federal court for a specific charge here, I don't think it really reflects the universe of the work that's done by the law enforcement agency that investigates human trafficking and the exploitation of women and children.

> *And I don't think there's a sufficient basis here to go forward with any claim here that there's discriminatory intent*, particularly given the nature of the offense where *no one*

*solicited the defendant. He initiated the conduct here with the undercover officer. So it's difficult to even figure out how the government would have known his race or gender based on the initial communications on the internet which are anonymous.*

So the motion is denied and we will be proceeding to our trial on Monday.

After counsel for both sides presented more arguments, the district court then added:

Thank you. And I do think that *the cases that were identified by the defendant tend to reflect more of a prosecutorial decision-making* as to what charge will be brought and where as opposed to demonstrating that the task force is selectively targeting black men for investigation in the nature of these crimes.

We, however, presume that trial judges "know the law" and "apply it in making their decisions." *Walton v. Arizona*, 497 U.S. 639, 653 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002). The record here shows that Green's motion for discovery outlined the correct legal standard in *Sellers* and that before issuing its decision, the district court explicitly stated it had "read the papers submitted on the motion for the discovery." Given this presumption, we hold that the district court applied the correct standard and address Green's three arguments below.

### i. *Discriminatory intent*

Green first argues that the district court applied the wrong legal standard when it concluded that there was not

"a sufficient basis here to go forward with any claim . . . that there's discriminatory *intent*."  He notes that this court held in *Sellers* that although a defendant "will eventually need to show both elements" (*i.e.*, discriminatory effect and intent) to prevail on a selective enforcement claim, a defendant seeking discovery does *not* have to show the existence of both elements.  *See Sellers*, 906 F.3d at 856.

But the district court did not require a showing of discriminatory intent to obtain discovery.  Rather, it denied Green's motion because the evidence he presented consisted of only "a very small number of individuals" who were "prosecuted in federal court for a specific charge here" and did not "really reflect[] the universe of the work that's done by the law enforcement agency."  To support Green's claim of selective enforcement based on race, his counsel offered only six other cases in the Southern District of California in the past ten years "in which defendants were charged with violating the same statutes as those at issue in [Green's] case."  Defense counsel "looked for cases in which the arrest appeared to result from a social media sting operation, where an undercover law enforcement officer posed as an underage female."  Conversations with defense counsel from those cases confirmed that each of those defendants was a Black man.

The district court rejected Green's evidence of selective enforcement because the sample size was too small to be reliable—a mere six other cases in the past ten years.  And the sample size may have been tiny because its parameters were intentionally selective:  It ignored state-level prosecutions and did not include cases involving similar sex-trafficking-related offenses that may have been charged under different statutes.  Under *Sellers*, the district court has discretion in analyzing whether the proffered evidence of

selective enforcement merits discovery.  *Id.* at 855 (noting a district court "should use its discretion" to decide motions for discovery "based on the reliability and strength of the defendant's showing").  The district court did not abuse its discretion in finding that Green's sample size of selective enforcement was too small and threadbare to justify intrusive discovery.

Green latches onto the district court's off-hand comment about "intent" to suggest it required him to show evidence of intent.  But we do not flyspeck oral comments made by a judge as if they are words in a statute.  *Cf. Fed. Trade Comm'n v. Microsoft Corp.*, 136 F.4th 954, 966 (9th Cir. 2025) (stating that we do not review a court's "out-of-context, isolated phrases" and instead review its comments "as a whole, and in context").  Viewing the comments in full and in context, the district court appears to have relied mainly on the thin reed of selective enforcement evidence provided by Green.  Indeed, the district court noted Green's sparse showing on discriminatory effect before saying, "*And* I don't think there's a sufficient basis here to go forward with any claim here that there's discriminatory intent."  The district court's use of the word "and" suggests that its later, impromptu reference to "intent" was superfluous.

### ii.  *First contact*

Next, Green argues that the district court applied the wrong legal standard when it suggested that a selective enforcement claim was not viable "given the nature of the offense where no one solicited the defendant" and "[h]e initiated the conduct here with the undercover officer."  Green argues that we should follow the Seventh Circuit's decision in *United States v. Davis*, 793 F.3d 712 (7th Cir. 2015) (en banc), and reject the use of such distinctions when

evaluating selective enforcement discovery motions. *Id.* at 722–23.

In *Davis*, the government similarly argued that race could not have played a role in law enforcement's investigation and arrest because the defendant "himself initiated matters by pestering the informant for robbery opportunities and then chose his own comrades" for a stash-house robbery. *Id.* But the Seventh Circuit rejected this suggestion, noting that even with that factual background "it remains possible that [law enforcement] would not have pursued this investigation had [the defendant] been white." *Id.* at 723.

Green also argues that even if he were the first to send a direct message, he sent that message *after* the deputy posing as "Lexi" viewed some of his Instagram stories. Thus, the deputy was not a passive individual who was contacted by Green, according to him. And even if Green's Instagram account did not have a profile picture from which the deputy could discern Green's race, Green speculates that his Instagram "stories" could have contained photos of him— precisely the type of thing that additional discovery might uncover.[2]

That said, at no point did the district court state that a selective enforcement claim was not viable because Green made the first contact. Instead, it noted that the unique nature of the social media sting made Green's claim of selective enforcement *less likely* or, as the district court put

---

[2] We acknowledge that Green, like the deputy, could have presented a false identity or could have intentionally concealed his race. In evaluating Green's selective enforcement claim, though, we must look at what evidence of Green's race law enforcement had and what law enforcement *believed* Green's race to be. Here, that is unclear.

it, "difficult." In other words, "the nature of the offense where no one solicited the defendant" was a factor the district court could consider in evaluating "the reliability and strength of the defendant's showing" of selective enforcement, even if some inferences it drew are not entirely convincing. *See Sellers*, 906 F.3d at 855. Because the district court did not foreclose the possibility of a selective enforcement claim based on the nature of the offense and who initiated contact, its statements do not establish that it applied an incorrect legal standard, even if we were to adopt the Seventh Circuit's approach in *Davis*. *See Davis*, 793 F.3d at 722–23 (noting that even though the defendant "initiated matters," it "remains possible that [law enforcement] would not have pursued th[e] investigation had [the defendant] been white").

### iii. *Prosecutorial statistics*

Finally, Green argues that the district court erred when it concluded that the other six cases from the Southern District of California cited by Green "tend to reflect more of a prosecutorial decision-making" process "as opposed to demonstrating that the task force is selectively targeting black men for investigation." As this Court noted in *Sellers*, "[a]sking a defendant claiming selective enforcement to prove who *could* have been targeted by an informant, but was *not*, or who [law enforcement] *could* have investigated, but did *not*, is asking him to prove a negative; there is simply no statistical record for a defendant to point to." *Sellers*, 906 F.3d at 853. A defendant might need to turn to *prosecutorial* statistics even if the claim he wishes to prove is ultimately selective *enforcement*.

Once again, the district court's decision presents an ambiguity from which one can draw two potential

conclusions. If one reads the district court's comment as a categorical statement that the type of evidence Green submitted was not probative of a selective enforcement claim and thus did not support his motion for discovery, then it likely abused its discretion under *Sellers*. If, however, one reads the comment as an expression of doubt about *how* probative Green's evidence was, then it acted within its discretion, as we noted earlier that the small sample size rendered the claim of selective enforcement unreliable. We find this latter interpretation is better supported given the district court also expressed concern that Green's evidence did not include state prosecutions—an indication that the district court *agreed* prosecution evidence is relevant to a selective enforcement claim but that Green's prosecution evidence was weak given its limited size. Overall, it appears that the district court denied Green's motion because it did not find his argument—which was based on just six federal cases—very compelling. This was a permissible reason under *Sellers*. Thus, the district court did not abuse its discretion in denying Green's motion for discovery.

## II. The district court properly considered Green's unwarranted disparity claim and thus did not abuse its discretion in sentencing Green.

"All sentencing proceedings are to begin by determining the applicable Guidelines range." *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc). Next, the parties "must be given a chance to argue for a sentence they believe is appropriate." *Id.* The district court must then "consider the § 3553(a) factors to decide if they support the sentence suggested by the parties." *Id.* "Section 3553(a) lists seven factors that a sentencing court must consider." *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007). This

includes "the need to avoid unwarranted sentence disparities." *Id.* (quoting § 3553(a)(6)).

Although the district court must consider all the factors, it "need not tick off each of the § 3553(a) factors to show that it has considered them," *Carty*, 520 F.3d at 992, and the weight to be given to any particular factor is at the sole discretion of a sentencing court, *United States v. Gutierrez-Sanchez*, 587 F.3d 904, 908 (9th Cir. 2009). That said, "when a party raises a specific, nonfrivolous argument tethered to a relevant § 3553(a) factor in support of a requested sentence, then the judge should normally explain why he accepts or rejects the party's position." *Carty*, 520 F.3d at 992–93.

## A. The district court did not err in imposing a 144-month sentence.

Green argues that the district court procedurally erred by "refusing to consider" his unwarranted sentencing disparity claim in sentencing him to 144 months. At sentencing, Green faced a 188 to 235-month Guideline range given the nature of his offense and criminal history. He also faced a 120-month statutory minimum. In Green's sentencing memorandum and at the sentencing hearing, Green's counsel asked the district court to impose the lowest sentence allowed by law: 120 months in custody. Counsel argued that a higher sentence "would treat [Green] in a manner disparate from other similarly situated individuals." In support of this argument, Green's counsel pointed to the sentences of 14 other defendants who were all convicted of the same or similar conduct, all but one of whom received a sentence of 120 months or less. The district court still sentenced Green to 144 months.

In support of his argument that the district court procedurally erred by "ignoring" his sentencing-disparity argument, Green points to two statements the district court judge made during his sentencing hearing. *See United States v. Bragg*, 582 F.3d 965, 969 (9th Cir. 2009) ("The very broad discretion of district judges in sentencing . . . does not extend to *ignoring* sentencing factors mandated by statute." (emphasis added)).    First, Green notes that although he provided information about 14 other defendants, the district court judge admitted: "I didn't go and read each case and I didn't look at the facts in each case."    Second, Green notes that the district court judge declared: "I can't do those comparisons.    It would require that the Court spend hours reviewing each case, each individual, all the factors that go into it."

The statements Green cites appear at first to show a district court judge failing to engage with counsel's disparity argument simply because doing so would be hard or cumbersome.    But a review of the entire transcript paints a different picture—one in which the district court (1) knew at least a bit about each of the cases counsel submitted (for example that they all involved defendants with a lower criminal history) and (2) was more interested in calculating a sentence that reflected Green's particular circumstances than assigning him a sentence based on some average of sentences imposed in the other cases.    The district court observed:

> You know, counsel, I appreciate when counsel gives these sort of statistics, but there's so much more to each case and I didn't go and read each case and I didn't look at the facts in each case.  They are not cases

that this court handled; and the criminal histories of those people are lower and their backgrounds may be very different and the nature and circumstances and whether they plead early, and did they get some equivalent of an appellate waiver? So it's very difficult to just look at the numbers and say that's the [arithmetic] mean and that that's what should apply here.

Let's talk about this defendant rather than other cases because I think that—frankly, I think the letter from his parents was the most important piece of information that I got to help explain [Green] and why he's here and what he's been doing with his life up to now and what the future bodes for him and how much of a risk he is to himself and society and what's really the appropriate punishment beyond whether there's anything above the mandatory minimum.

Indeed, at the sentencing hearing, the prosecution confirmed the district court's understanding that the defendants in the cases Green submitted were not similarly situated because of differences such as the defendants' criminal histories and decision to plead early. *See United States v. Espinoza-Baza*, 647 F.3d 1182, 1195 (9th Cir. 2011) ("It does not matter for the purposes of § 3553(a) that [the defendant] can point to other criminal defendants who may have received lighter sentences under materially different circumstances." (cleaned up)).

The prosecution noted:

> There is no comparison between [Green] and these other individuals. The only potential case for comparison would be the Franklins father-son duo who also did not accept responsibility and also went to trial; but even they are extremely distinct. For one of them, it was his very first offense. For the other, he only had a misdemeanor history. . . . So the government submits that [Green] can't be fairly compared to them either.

> There's simply nobody else on this list that [had already] received a 220-month sentence [like Green had], served over eight years, and then a mere three months after being released from custody started sending rampant social media messages in an effort to revamp their pimping activity, and then one month after that contacted a minor female in an attempt to entice her into prostitution.

Although Green argues that the district court procedurally erred by "refusing to consider" his unwarranted sentencing disparity claim, a review of the record shows that the district court *did* consider the claim. The district court rejected the claim, however, because its initial review of the cases counsel submitted—or its initial review of the prosecution's summary of those cases—revealed that the defendants in those cases were not similarly situated to Green. Indeed, the district court explicitly stated, "I don't feel like I was presented with a similarly-situated person to consider."

Because the district court (1) gave the parties "a chance to argue for a sentence they believe[d] [was] appropriate," and (2) "consider[ed] the § 3553(a) factors to decide if they support[ed] the sentence suggested by the parties," we find no procedural error in the district court's sentencing. *Carty*, 520 F.3d at 991. We also find that Green has failed to show that the district court's 144-month sentence is substantively unreasonable. *See Gall*, 552 U.S. at 51. We thus affirm the 144-month sentence imposed by the district court.

## CONCLUSION

We **AFFIRM** the district court's denial of Green's motion for discovery and **AFFIRM** the sentence imposed by the district court.